

**FILED**

Nov 30 2020, 10:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi K. Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Camron Douglas Perkins,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 30, 2020

Court of Appeals Case No.
20A-CR-695

Appeal from the Henry Circuit
Court

The Honorable Kit C. Dean Crane,
Judge

Trial Court Cause No.
33C02-1611-MR-3

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Camron Perkins (Perkins), appeals his conviction for one Count of felony murder, Ind. Code § 35-42-1-1(2), and one Count of attempted murder, a Level 1 felony, I.C. §§ 35-42-1-1(1); -41-5-1(A)

We affirm.

# ISSUES

Perkins presents three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion by admitting certain evidence; and

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to support Perkins' attempted murder conviction.

# FACTS AND PROCEDURAL HISTORY

After a seven-year relationship, in July of 2016, Sierra Cochran (Cochran) broke up with her boyfriend, Jessie Fulton (Fulton). Fulton did not take the breakup well, and he often threatened Cochran and Cochran's housemate Sheriton Winchester (Winchester). In the Fall of 2016, Fulton moved in with Kendra Williams (Williams) and her boyfriend Justin Gibson (Gibson), who lived at 6251 South County Road 325 West in Spiceland, Indiana. Fulton's new girlfriend, Danielle Flick (Flick), and other friends including Chance Smith (Smith), often stayed at the house.

[5] Fulton kept a deadbolt on his bedroom door and was selling drugs from Williams/Gibson's house. Due to his drug dealing activities, by November 2016, Williams and Gibson wanted Fulton to move out. Also, around November 2016, Cochran began dating Tyler Pennington (Pennington), and Winchester, Cochran's housemate, began dating Pennington's half-brother, Devin Asberry (Asberry). Fulton, who was a former friend to both Asberry and Pennington, was upset by this and he told Cochran he would make her life "[a] living hell" and he threatened her life and the lives of her family. (Transcript Vol. III, p. 162). Fulton also threatened Asberry's life, and the life of his young son. On two occasions, Pennington and Asberry went to Fulton's home to try and resolve the issues Fulton had with them. The first time Fulton refused to talk with them, it got heated, and Gibson, Fulton's housemate, made them leave. On the second occasion, Fulton pulled two guns on Pennington and Asberry and chased them away. Both times, Pennington and Asberry were unarmed.

[6] On Saturday morning, November 5, 2016, Asberry approached Perkins, who was his coworker and friend, and he shared that Fulton had pulled guns on him and Pennington. Asberry stated that he wanted to go to Fulton's house to beat up Fulton and Perkins offered to help. The following morning, Perkins met with Asberry, Pennington, Cochran, and Winchester at Cochran/Winchester's home. Perkins came prepared with a ski mask, gloves, and two handguns: a Remington .45 caliber semi-automatic handgun and a Colt .22 caliber semi-automatic handgun. Perkins, Asberry, and Pennington discussed scaring and

beating Fulton.  Perkins stated that he wanted to "pistol whip" someone.  (Tr. Vol. III, p. 176).  Asberry and Pennington sent their girlfriends Cochran and Winchester to Walmart to buy long sleeve shirts to cover their2 tattoos, toboggan masks, gloves, and duct tape.

[7]     On November 7, 2016, at approximately 3:00 a.m., Perkins, Asberry and Pennington drove to Fulton's house.  Each of them possessed a handgun: Perkins was armed with the Remington .45 handgun; Asberry possessed Perkins' Colt .22 handgun; and Pennington was armed with a 9mm handgun. Pennington parked about one-half mile from Fulton's house, and the three men walked through a cornfield and woods to get to Fulton's house.  While watching the house from a distance, Perkins and Asberry developed cold feet and wanted to abort the mission but Pennington was "kind of pumped up about it" since he had "never done anything like that."  (State's Exh. VIII, p. 25). Nonetheless, they all proceeded with the plan.  Perkins approached the back door and observed Smith sitting on the couch texting on his phone.  With Pennington's encouragement, Perkins entered Fulton's house by opening the unlocked back door.  Pennington and Asberry followed behind.  Once inside, Perkins ordered Smith not to move.  Pennington and Asberry proceeded to forcefully open Williams' and Gibson's bedroom door.  Twice, Asberry demanded Williams' phone, but Williams stated that she did not have one. Before Asberry and Pennington exited Williams' and Gibson's bedroom, they ordered Williams not to move.  Scared of the men, Williams threw a blanket over her face.  Gibson remained asleep in their bed.

[8] Meanwhile Perkins, who was watching Smith in the living room, stepped away and walked toward Fulton's bedroom door. Perkins kicked it open, and Asberry and Pennington stormed into Fulton's bedroom. Asberry and Pennington demanded money and the safe from Fulton. Fulton was subsequently hit with a gun as he tried to wrestle with one of them. The gun discharged, and Fulton's girlfriend, Flick, screamed and threw a blanket over herself. To defend himself, Fulton grabbed his .38 revolver from underneath his bed and fired all five rounds at Pennington and Asberry. Pennington and Asberry returned fire. Perkins appeared to have returned to the living room, and he shot Smith in the right shoulder with his Remington .45 caliber handgun. All three men then ran out of Fulton's house.

[9] Perkins and Asberry ran back through the cornfield to where they had parked their vehicle while Pennington, who had been shot by Fulton in his left arm, ran in a different direction. While running toward the vehicle, Asberry threw his shirt, toboggan mask, and gloves down. On their drive back to Cochran/Winchester's house, Perkins threw his mask and gloves out of the window. With no means to get home, Pennington called Cochran to pick him up. She found Pennington bleeding on the side of the road. Pennington told Cochran that Fulton had shot him and that he had shot Fulton in return. Before going to the hospital, Cochran drove Pennington to his cousin's house where he left his 9 mm handgun.

[10] Meanwhile at Fulton's house, Smith approached Gibson's girlfriend, Williams, and told her that he needed help because he was losing a lot of blood. As

Williams followed Smith back to the couch, she saw Fulton on his bedroom floor screaming in pain from a gunshot wound to his right shoulder. Williams attempted to stop Smith's bleeding, while Fulton's girlfriend, Flick, called 911. Despite medical intervention at the hospital, Smith died. The bullet recovered from Smith's body was fired from Perkins' Remington .45 semi-automatic handgun.

[11] Several hours after the shooting, the New Castle Police Department interviewed Asberry, Cochran, and Winchester. From those interviews, Perkins became a person of interest in the shooting. Later that afternoon, Perkins voluntarily presented himself at the police station to give a statement. Captain Detective Scott Ullery (Captain Ullery) and Detective Mark Reece (Detective Reece) conducted the interview. Perkins was given his *Miranda* warnings and he waived those rights. After he repeatedly denied his role in the shooting, Perkins requested an attorney. At that point, Captain Ullery and Detective Reece stopped the interview, but before exiting the room, they informed Perkins that he was being detained for the investigation. A short time thereafter, Perkins requested a cigarette, and Captain Ullery asked Sergeant Chase Hightower (Sergeant Hightower) to take Perkins outside so that he could smoke the cigarette. Captain Ullery advised Sergeant Hightower not to question Perkins about the shooting since Perkins had invoked his right to counsel.

[12] Sergeant Hightower and Perkins knew each other from prior encounters. While smoking, Perkins spontaneously stated to Sergeant Hightower that he did not

shoot anybody, and, twice, Sergeant Hightower reminded Perkins that he could not directly speak with him about the case. Perkins also indicated that he did not like Detective Reece's disrespectful attitude toward him, and he preferred having a second interview with Sergeant Hightower. Sergeant Hightower stated that he was not sure if that was possible and he had to consult with his superior. Sergeant Hightower, however, warned Perkins that Captain Ullery would be present at a second interview. Perkins stated that he was okay with that. Sergeant Hightower subsequently placed Perkins back in the interview room and approached Captain Ullery, who then consulted with the prosecutor.

[13] Approximately eleven minutes after the first interview ended, Sergeant Hightower and Captain Ullery entered the interview room to commence a second interrogation and the following exchange occurred:

> [Captain] Ullery: [Perkins] you were advised of your rights earlier do you understand your rights are still in force and you have not waived those rights, do you understand that?
>
> Perkins: Yeah, well I did waive my rights but now I'm not.
>
> [Captain] Ullery: Well, . . . what I'm saying is, you were advised of your rights and you understand what your rights were and during our first interview you uh, said that you thought you might want to talk to an attorney, now it's my understanding that you contacted [Sergeant] Hightower and have reinitiated contact with us and you want to talk to us.

Perkins:  Well I just, I just want to talk about like what's going on and like the options and like what charges are being brought up and stuff like that . . .

[Sergeant] Hightower:  Here's the thing, do you want to talk to us or not?  It's yes or no[?]

[Captain] Ullery:  You've already initiated contact, I can't tell you where the investigation is going . . .

Perkins:  I don't want to go to prison guys, I don't want to get in trouble[.]

[Captain] Ullery:  . . . I came back in here because I was told you want to talk to us, so . . . do you want to talk to us or not, it's totally up to you?

Perkins:  I don't know man . . .

Perkins:  Sure[.]

[Captain] Ullery:  So is that a yes?

Perkins:  yeah[.]

(State's Exh. Vol. VIII, pp. 12-13).  After being questioned repeatedly regarding the shooting, Perkins agreed to talk.  Perkins began explaining that the day before the shooting, he was at work when Asberry approached him and shared with him about Fulton pointing a gun at him and making death threats. Perkins responded by stating that Asberry should beat Fulton's "ass." (State's

Exh. VIII, p. 19). Asberry and Perkins then talked about "guns and stuff" and about taking Fulton's safe which contained money and drugs. (State's Exh. VIII, p. 19). Perkins agreed to meet Asberry and Pennington later that day. Perkins confessed that the original plan was to go Fulton's house and scare him and not engage in a shootout. Notwithstanding his statement, Perkins stated that he brought his Remington .45 handgun and his Colt .22 handgun with him to Fulton's. Perkins added that he maintained possession of the Remington .45 handgun, while Asberry had his Colt .22 handgun and Pennington had his own 9mm handgun. Perkins stated that he did not know if he discharged his gun since he was very scared. Perkins believed that either the 9mm handgun which Asberry had or the Colt .22 handgun which Pennington had at the time of the shooting killed Smith because he did not shoot anyone. Perkins then stated that both of his handguns were at his mother's house. Pursuant to a search warrant, both handguns were recovered.

[14] On November 10, 2016, the State filed an Information, charging Perkins with two Counts of felony murder and one Count of attempted murder, a Level 1 felony. On December 20, 2019, Perkins filed a motion to suppress the incriminating statements he made during the second interview. On January 13, 2020, the trial court conducted a hearing, and took the matter under advisement. The following day, the trial court issued an Order, denying Perkins' motion to suppress the statements he made during his second interview after determining that while Perkins had validly invoked his right to counsel during the first interview, Perkins "initiated further discussions with law

enforcement officers and knowingly and intelligently waived the right previously invoked." (Appellant's App. Vol. II, p. 116).

[15] A jury trial commenced on January 27, 2020. Winchester and Cochran admitted that they went to Walmart to buy toboggans, black shirts, gloves, and duct tape because Asberry and Pennington had asked them to go purchase the items. They also claimed that Pennington and Asberry had discussed going to Fulton's house to confront Fulton. There were also discussions by Pennington to take Fulton's safe which possibly contained money and drugs. Cochran stated that Perkins did not actively participate in the discussions, however, Cochran heard Perkins say that he wanted to pistol whip someone. Cochran testified that shortly after the shooting, Pennington called her to come pick him up and she found him bleeding on the side of the road. Pennington told Cochran he had shot Fulton. Over Perkins' objection, the trial court admitted Perkins' video interviews. Further, the autopsy report revealed that Smith died from a gunshot wound to his right shoulder. An Indiana State Police analyst opined that the fatal gunshot that killed Smith was fired from Perkins' Remington .45 semi-automatic handgun.

[16] At the close of the evidence, the jury found Perkins guilty as charged. At sentencing, the trial court vacated one of the felony murder verdicts. The trial court then imposed a sixty-year sentence on the remaining felony murder conviction, and a consecutive thirty-five-year sentence on the Level 1 felony attempted murder.

Perkins now appeals.  Additional information will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Admission of the Evidence*

When ruling on the admissibility of evidence, the trial court is afforded broad discretion, and we will only reverse the ruling upon a showing of abuse of discretion.  *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000).  An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court.  *Id*.  We consider the evidence most favorable to the trial court's ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling.  *Id*.

Perkins contends that the statements he made during the second interview were obtained in violation of his Fifth Amendment right to counsel and that the trial court therefore abused its discretion in admitting them.

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  This constitutional safeguard is applicable to the several states via the Fourteenth Amendment.  *Bleeke v. Lemmon*, 6 N.E.3d 907, 925 (Ind. 2014).[1]  In *Miranda v.*

---

[1] We note that Article 1, Section 14 of the Indiana Constitution also provides individuals with a similar right to be free from self-incrimination.  Perkins, however, does not make any cognizable argument under the

*Arizona*, 384 U.S. 436, 469 (1966), the United States Supreme Court held that, to protect this right against self-incrimination, a suspect must be informed of the right to remain silent and the right to have counsel present during a custodial interrogation. The *Miranda* Court further held that when an "individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Id.* at 474. Accordingly, if a person in custody unequivocally invokes his right to counsel, police must immediately and "scrupulously honor" that request and cease all further interrogation, unless the suspect initiates further communication with the police. *Bean v. State*, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012) (citing *Miranda*, 384 U.S. at 479), *trans. denied*. Although police stations are not required to "have a 'station house lawyer' present at all times to advise prisoners[,]" law enforcement must cease questioning an individual until he has the opportunity to consult with counsel. *Miranda*, 384 U.S. at 474.

[21] Even if the accused initially elects to waive his rights, such waiver may later be rescinded at any time, and "[i]f the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010) (quoting *Berghuis v. Thompkins*,

---

Indiana Constitution. For this reason, we do not discuss Article 1, Section 14 and focus our analysis solely on the Fifth Amendment. *See Haviland v. State*, 677 N.E.2d 509, 513 n.2 (Ind. 1997).

560 U.S. 370, 387-88 (2010)). Where the police continue to question an individual after he has indicated he wants an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

[22] If, however, the accused on his own "initiates further communication, exchanges, or conversations" with law enforcement, then the accused may be questioned further without counsel present. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Subsequent cases from the Court "have interpreted [*Edwards*] to mean that the authorities may not initiate questioning of the accused in counsel's absence." *Minnick v. Mississippi*, 498 U.S. 146, 152 (1990).

[23] The initiation of further communication by an accused, standing alone, is not sufficient to establish a waiver of the previously asserted right to counsel. *Osborne v. State*, 754 N.E.2d 916, 922 (Ind. 2001). If the accused did initiate further communication, then the subsequent inquiry is whether there is a valid waiver of the right to counsel, *i.e.*, whether the purported waiver was knowing and intelligent under the totality of the circumstances. *Id*. "[E]ven if a conversation . . . is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).

[24]     A few hours after the shooting, Perkins presented himself at the police station for questioning. Perkins was given his *Miranda* warnings and he waived those rights. After repeatedly denying his involvement in the attempted robbery of Fulton's drugs and money and in the shootings of Smith and Fulton, he invoked his right to counsel. Captain Ullery and Detective Reece ended the interview, informed Perkins that he was not free to leave, and they exited the interrogation room. Perkins then requested a cigarette. Sergeant Hightower was asked to accompany Perkins outside to smoke a cigarette but was cautioned not to question Perkins about the impending investigation since Perkins had requested an attorney. Once outside, Perkins spontaneously declared that he did not shoot anybody, and twice, Sergeant Hightower reminded Perkins that he could not speak with him about the case. Perkins then informed Sergeant Hightower that he was willing to be interviewed by him, but he did not want Detective Reece present at a second interview. Approximately eleven minutes after the first interview ended, Perkins was again put in the interrogation room since he had initiated conversation with Sergeant Hightower. At the start of the second interview, Captain Ullery attempted to clarify if Perkins wanted to make further statements regarding the robbery and shooting despite the fact that Perkins had invoked his right to an attorney, and the following exchange occurred:

> [Captain] Ullery: [Perkins] you were advised of your rights earlier do you understand your rights are still in force and you have not waived those rights, do you understand that?

Perkins:  Yeah, well I did waive my rights but now I'm not.

[Captain] Ullery:  Well, . . . what I'm saying is, you were advised of your rights and you understand what your rights were and during our first interview you uh, said that you thought you might want to talk to an attorney, now it's my understanding that you contacted [Sergeant] Hightower and have reinitiated contact with us and you want to talk to us.

(State's Exh. Vol. VIII, p. 12).  When Perkins answered Captain Ullery's question with, "I just want to talk about like what's going on and like the options and like what charges are being brought up and stuff like that," Sergeant Hightower cut Perkins off and the following exchange then occurred

[Sergeant] Hightower:  Here's the thing, do you want to talk to us or not?  It's yes or no[?]

[Captain] Ullery:  You've already initiated contact, I can't tell you where the investigation is going . . .

Perkins:  I don't want to go to prison guys, I don't want to get in trouble[.]

[Captain] Ullery:  . . . I came back in here because I was told you want to talk to us, so . . . do you want to talk to us or not, it's totally up to you?

Perkins:  I don't know man . . .

Perkins:  Sure[.]

[Captain] Ullery:  So is that a yes?

Perkins: [Y]eah[.]

(State's Exh. Vol. VIII, pp. 12-13).

[25] Here, it is evident that Perkins was fully advised of his rights at the beginning of the first interview, he stated that he understood his *Miranda* rights, and signed a written waiver. After a few minutes of questioning, Perkins invoked his right to counsel, and Captain Ullery and Detective Reece immediately terminated the interview. Approximately eleven minutes later, however, Perkins changed his mind and reinitiated communication. He told Sergeant Hightower that he wanted to talk to the police. The second part of the interview began with Captain Ullery reminding Perkins that he had been given his *Miranda* warnings and that he had invoked his right of counsel. Because Captain Ullery reminded Perkins of his *Miranda* rights prior to the second interview and verified that he understood these, Captain Ullery's caution that Perkins rights still applied when Perkins restarted the interrogation is sufficient to establish that Perkins voluntarily waived his right to counsel upon resumption of the police interview. *See Osborne*, 754 N.E.2d at 922.

[26] Moreover, there is no evidence, and Perkins does not direct us to any, that he lacked the capacity to understand his rights, and at no point did Sergeant Hightower and Captain Ullery threaten, intimidate, deceive, or make promises in order induce Perkins to continue the second interview. *Osborne*, 754 N.E.2d at 922. Likewise, the decision to waive his right to counsel at the start of the second interview was an informed one. Based on the totality of the

circumstances, we conclude that Perkins knowingly, voluntarily, and intelligently waived his right to counsel following his request for an attorney. Accordingly, we hold that Perkins' right to counsel was not violated and the trial court did not abuse its discretion by admitting the statements Perkins made during the second interview.

## II. *Sufficiency of the Evidence*

[27] Perkins argues that there was insufficient evidence to convict him of Level 1 felony attempted murder of Fulton. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[28] A person who "knowingly or intentionally kills another human being" commits murder, a felony. I.C. § 35-42-1-1(1). Indiana's attempt statute states: "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same level or class as the crime attempted. However, an attempt to commit murder is a Level 1 felony." I.C. § 35-41-5-1(a).

[29] Perkins argues that "the State did not present any evidence that [he] even shot towards Fulton." (Appellant's Br. p. 18). The State argues that the jury properly found that Perkins had an intent to kill Fulton when he aided Pennington in the attempted murder of Fulton.

[30] A conviction for attempted murder requires proof that the defendant had the specific intent to kill. *Spradlin v. State*, 569 N.E.2d 948, 949 (Ind. 1991). Under Indiana's accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense[.]" I. C. § 35-41-2-4. To convict a defendant for attempted murder under accomplice liability also requires the State to prove the defendant, "with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused his accomplice to commit the crime of attempted murder." *Bethel v. State*, 730 N.E.2d 1242, 1246 (Ind. 2000). Thus, when the State seeks to convict a defendant of attempted murder on an accomplice liability theory, it must prove: "(1) that the accomplice, acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that the defendant, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the accomplice to commit the crime of attempted murder." *Id*.

[31] Accomplice liability applies to the contemplated offense, as well as all acts that are a probable and natural consequence of the concerted action. *Wieland v. State*, 736 N.E.2d 1198, 1202 (Ind. 2000). The jury was instructed that Perkins could be convicted as an accomplice to Pennington, who was charged with the

attempted murder of Fulton. To determine whether a defendant aided another in the commission of the crime, the fact-finder considers: (1) presence at the crime scene; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wright v. State*, 950 N.E.2d 365, 368 (Ind. Ct. App. 2011). As a general rule, mere presence at the scene of the crime is not itself sufficient to allow an inference of participation in the crime. *Griffin v. State*, 413 N.E.2d 293, 295 (Ind. Ct. App. 1981). Such presence may, however, be considered with other evidence as a factor in determining a defendant's guilt. *Id.*

[32]  Williams, Gibson, and Fulton, all testified to the confrontation between Fulton, Asberry, and Pennington, during which Fulton pointed his guns at Asberry and Pennington. Cochran and Winchester testified that Perkins came to their residence and discussed with Asberry and Pennington a plan of confronting Fulton. The plan was to "shut it down" and put an "end to the arguing." (Tr. Vol. III, p. 112-13). Asberry and Pennington specifically talked about shooting "if something bad happen[ed]." (State's Exh. Vol. VIII, p. 8). Perkins stated that he wanted to "pistol whip" someone, presumably Fulton. (Tr. Vol. III, p. 176).

[33]  Knowing that a gun battle with Fulton was highly probable, Perkins offered his help. When Perkins presented himself at Cochran/Winchester's residence, he brought with him a ski mask, gloves, and two handguns—the Remington .45 handgun that killed Smith and the Colt .22 handgun that he lent to Asberry.

Winchester testified that on the day of the shooting, Perkins, Asberry, and Pennington were each armed with handguns before they left for Fulton's house.

[34] When the three men arrived at Fulton's residence, Perkins entered first and he secured Smith, and then waited while Asberry and Pennington terrorized Williams in her bedroom. To further offer his assistance with the plan of attacking Fulton, Perkins, who was watching Smith, momentarily left Smith and walked toward Fulton's bedroom door and kicked it in. Moments later, Asberry and Pennington stormed into Fulton's bedroom, and as anticipated by all, a gun battle ensued. Both Fulton and Smith were shot in the process. Perkins, Asberry, and Pennington thereafter ran out of Fulton's house. Perkins and Asberry drove back together to Cochran/Winchester's residence. However, Pennington, who had been shot, ran in a different direction, and had no means to return to Cochran/Winchester's house. Pennington called Cochran, who picked him up by the side of the road. Pennington admitted to Cochran that he had aimed and shot at Fulton.

[35] In sum, Perkins knew that Asberry and Pennington intended violence on Fulton by confronting Fulton at his home with guns, and possibly stealing his drugs and money. Asberry and Pennington specifically talked to Perkins about shooting if something bad happened. Perkins indicated that he wanted to pistol whip someone. Perkins brought with him his two handguns to assist with the plan. At no time did Perkins oppose the commission of the crimes. Perkins was present at the crime scene and he actively participated by kicking in Fulton's door and shooting Smith. Pennington admitted to Cochran that he

had aimed and shot at Fulton. Lastly, while we note the plan of attacking Fulton and stealing from Fulton was not Perkins' plan, his course of conduct, before, during, and after the occurrence of the crimes showed that he actively participated in the attempted murder of Fulton. *See Wright*, 950 N.E.2d at 368. Viewing this evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to support Perkins' Level 1 felony attempted murder conviction.

## CONCLUSION

[36] In light of the foregoing, we hold Perkins' right to counsel was not violated and the trial court did not abuse its discretion by admitting the statements Perkins made during the second interview. In addition, we hold that the State presented sufficient evidence beyond a reasonable doubt to sustain the Perkins' attempted murder conviction.

[37] Affirmed.

[38] May, J. and Altice, J. concur